IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
ATHENS DIVISION

| | |
|---|---|
| ALICE FELTS, | * |
| Plaintiff, | * |
| vs. | * |
| PAMELA THAXTON, NATIONWIDE LIFE INSURANCE COMPANY and NATIONWIDE LIFE AND ANNUITY INSURANCE COMPANY, | *  CASE NO. 3:24-cv-129 (CDL) |
| Defendants. | * |

O R D E R

Alice Felts seeks to invalidate a beneficiary change to an annuity contract owned by David Silvian. Felts, who was previously designated as the primary beneficiary on the annuity, contends that Silvian did not have the mental capacity to execute the change, and/or that Pamela Thaxton unduly influenced Silvian to replace Thaxton as the primary beneficiary on the annuity. The parties waived a jury trial, and thus the Court conducted a bench trial on November 3-4, 2025.[1]

After considering the evidence presented at trial, the Court finds that Plaintiff Felts failed to carry her burden of showing by a preponderance of the evidence (1) that Silvian lacked the

---

[1] The Court has jurisdiction over this action based upon diversity of citizenship.

mental capacity to execute the beneficiary change, and/or (2) that Thaxton unduly influenced Silvian to make the change.  Accordingly, the beneficiary change shall not be disturbed, and Thaxton is entitled to the annuity proceeds.  Federal Rule of Civil Procedure 52(a)(1) requires the Court to "find the facts specially and state its conclusions of law separately."  Those findings and conclusions follow.[2]

## FINDINGS OF FACT

Many of the facts are undisputed.  As to the disputed ones, the Plaintiff, having the burden of proof, had the duty to prove the essential facts supporting her claim by a preponderance of the evidence, i.e., that they were more likely true than not true.

1. David Silvian and Alice Felts were married in June 2000.  Ms. Felts was Silvian's fifth wife.  At the time of their marriage, Silvian was 63 years old and Felts was 50.

2. Felts and Silvian separated in 2004 with Felts leaving the state of Georgia.  They finalized their divorce in June 2005.

3. They resumed long distance communication with each other regularly via telephone and e-mail.

---

[2] Defendant Thaxton made a motion for judgment as a matter of law at the close of Plaintiff's evidence and renewed the motion at the close of all the evidence. The Court deferred ruling on the motion. In light of today's verdict, the motion is now moot and shall be so terminated.

4. Notwithstanding their divorce, Silvian prepared a new will in 2006, naming Felts the primary beneficiary and executor of his estate. He also gave her his healthcare power of attorney.

5. Although they continued their regular remote contact after their divorce, Felts never physically visited Silvian and Silvian never physically visited Felts prior to Silvian's death.

6. In 2013, Silvian had a heart valve replacement and thereafter suffered from depression and anxiety.

7. On May 18, 2015, Silvian designated Felts the beneficiary of an annuity he purchased through Nationwide Life Insurance Company ("Nationwide Annuity"). Silvian had no children or other close family. He had very few close friends and only one with whom he maintained close contact, which contact was long distance via telephone and/or email.

8. On January 21, 2016, Silvian sent Felts an email stating how unhappy and lonely he was. Deeply depressed and suicidal, he made a plea for her to come back and be his companion. Felts declined.

9. In early 2017, Silvian fell at his house and was hospitalized. After he lost an in-home caregiver, he concluded that he needed to move into an assisted living facility. Given his physical size and his health conditions, he could not take care of himself at home alone.

10. Some time between February 26, 2017, and March 1, 2017, Silvian moved into Arbor Terrace, an assisted living facility in Oconee County, Georgia.

11. Rose Cleveland, the director of Arbor Terrace, requested that Pamela Thaxton assist Silvian in moving from his home to Arbor Terrace.

12. Pamela Thaxton worked for many years as a caretaker for various individuals.

13. Pamela Thaxton helped Silvian move himself and his belongings to Arbor Terrace beginning March 1, 2017. The first part of the move took approximately 3 days.

14. Subsequently, Thaxton assisted Silvian by moving his personal items, hanging pictures, fixing his phone, and performing other similar tasks.

15. Silvian paid Thaxton $20 an hour for these services, except the first three days were paid by Arbor Terrace.

16. Thaxton regularly visited Silvian with her dogs and played cards with Silvian. She did not charge him for all of these activities. Thaxton and Silvian quickly became friends. Thaxton had filled the loneliness void in Silvian's life by being nice to him and taking an interest in him as a friend.

17. On March 16, 2017, Silvian was seen by Dr. Michael Cobb, Silvian's primary care physician, for problems related to sensation in his leg. Although Dr. Cobb did not conduct a

complete psychological examination and did not administer dementia/memory related tests, Dr. Cobb did note that Silvian's mental and emotional responses during the examination were appropriate. And he found no indication of delirium, confusion, or hallucinatory behavior. While Dr. Cobb observed that Silvian generally suffered from long-standing depression, and sometimes exhibited abnormal psychological responses, particularly when he was experiencing infection-related medical conditions, Dr. Cobb did not find those types of acute symptoms at this particular visit. According to Dr. Cobb, Silvian appeared to have returned to his "psychological baseline," which meant that while he still had underlying depression, he was experiencing no acute psychological conditions that affected his mental capacity to understand and communicate.

18. On the evening after he saw Dr. Cobb earlier that day, March 16, 2017, Silvian signed a Beneficiary Designation form designating Thaxton the primary beneficiary on the Nationwide Annuity, replacing Felts who had previously been the primary beneficiary. He changed Felts to the secondary beneficiary on the Nationwide Annuity.

19. Silvian fully understood what he was doing when he executed the change of beneficiary for the Nationwide Annuity, and he appreciated the consequences of doing so. He knew that by

executing the change, Thaxton would receive the Annuity benefits at his death instead of Felts or anyone else.

20. Thaxton, at Silvian's request, did assist Silvian in filling out the change in beneficiary form. But Silvian directed her on how the form should be completed, and Silvian signed the form. Silvian did so under no threat, promise, misrepresentation, pressure, or coercion by Thaxton. To the contrary, Thaxton suggested that he make one of his family members or the animal shelter the beneficiary instead of her. She never suggested, requested or encouraged Silvian to make her the beneficiary of the Nationwide Annuity.

21. Although Silvian on isolated occasions referred to Thaxton as his "bookkeeper," the evidence does not support the conclusion that Thaxton managed or exercised any control over Silvian's finances. Silvian continued to control his finances. The "bookkeeper" reference appears to have arisen from Thaxton filling in a couple of isolated checks for Silvian at his direction, which checks were not made out to her or for her benefit and which were signed by Silvian.

22. In addition to providing Silvian with friendship-based companionship that involved regular visits with her dogs and to play cards, Thaxton would also run some errands for him such as picking up meals. Silvian did not pay her for the card and dog visits; he would reimburse her for the meals.

23. At the time that Silvian made Thaxton the beneficiary of the Nationwide Annuity, he was a strong-willed person, who liked to do things his own way, and was not easily manipulated into doing anything that he did not want to do. He did yearn for someone to pay attention to him and to be nice to him. With no family and no close friends nearby, it is reasonable to conclude from the evidence that he received great enjoyment the last year of his life by Thaxton filling this void. It is not shocking that he would want to benefit her financially.

24. Although Felts stayed in contact with Silvian after their divorce, she did not visit Silvian once after she left the state of Georgia in 2004. Even in his darkest hour when he was suicidal and pleading for help, she was unable to make the trip to see him.

25. Silvian died on April 22, 2018.

26. Shortly after Silvian's death, Felts first learned of the change in her beneficiary status on the Nationwide Annuity and brought the present action.

## CONCLUSIONS OF LAW

1. The Court applies Georgia substantive law in this case. Georgia law relating to wills and trusts provides some of the fundamental legal principles to be applied in this change of

   annuity beneficiary case. *Felts v. Thaxton*, 894 S.E.2d 627, 630 n.6 (Ga. Ct. App. 2023).

2. "[E]very person is presumed to have all [his] mental faculties and to be of normal and ordinary intelligence, and where it is contended that one who executed a contract was not competent to execute it, the burden is upon [she] who asserts the incompetency." *Kindred Nursing Ctrs. Ltd. P'ship v. Chrzanowski*, 791 S.E.2d 601, 605 (Ga. Ct. App. 2016) (second alteration in original) (quoting *Nelson v. State Farm Life Ins. Co.*, 344 S.E.2d 492, 494 (Ga. Ct. App. 1986)).

3. "A [change of beneficiary designation] is not valid if anything destroys the [designator]'s freedom of volition, such as . . . undue influence whereby the will of another is substituted for the wishes of the [designator]." O.C.G.A. § 53-4-12.

4. "A rebuttable presumption of undue influence arises when a beneficiary [designee] . . . occupies a confidential relationship with the [designator], is not the natural object of his bounty, and takes an active part in the planning, preparation, or execution of the [beneficiary designation]." *Bean v. Wilson*, 661 S.E.2d 518, 519 (Ga. 2008) (quoting *Bailey v. Edmundson*, 630 S.E.2d 396, 398 (Ga. 2006)). A confidential relationship exists where "one party is so situated as to exercise a controlling influence over the will, conduct, and

interest of another . . . ." O.C.G.A. § 23-2-58. Placing "general trust and confidence" in a beneficiary designee "is not sufficient to trigger the rebuttable presumption that undue influence was exercised." *Harper v. Harper*, 554 S.E.2d 454, 456 (Ga. 2001).

5. Even if someone has the mental capacity to enter into a contract or change an annuity beneficiary designation, diminished mental capacity may be considered in determining whether undue influence has been exercised:

> While the quantity of influence varies with the circumstances of each case, according to the relations existing between the parties and the strength or weakness of mind of the [designator], the amount of influence necessary to dominate a mind impaired by age or disease may be decidedly less than that required to control a strong mind.

*Dyer v. Souther*, 528 S.E.2d 242, 244 (Ga. 2000) (quoting *Skelton v. Skelton*, 308 S.E.2d 838, 842 (Ga. 1983)).

APPLICATION OF LAW TO FACTUAL FINDINGS

A. *Silvian's Mental Capacity*

As a factual matter, the Court has found that Silvian fully understood what he was doing when he executed the change of beneficiary designation making Thaxton the primary beneficiary of the Nationwide Annuity. Dr. Cobb's examination of Silvian on the very day that he signed the designation supports this conclusion. Furthermore, the

cognitive evaluation conducted upon his arrival at Arbor Terrace demonstrates that his cognitive functioning was well within the normal range. Felts has failed to carry her burden of proving by a preponderance of the evidence that Silvian did not have adequate mental competency to execute the beneficiary designation change.

### B. *Undue Influence*

Felts argues that Thaxton had a confidential relationship with Silvian such that a rebuttable presumption arises that she exercised undue influence on him to change the beneficiary designation on the annuity. But Felts failed to produce sufficient evidence to carry her burden of proving the existence of such a relationship by a preponderance of the evidence. The "smoking gun" consists of a few isolated references to Thaxton as Silvian's "bookkeeper." This off-hand description does not support the conclusion that a confidential relationship existed sufficient to give rise to this presumption. Although Felts had the opportunity to obtain all of Silvian's bank and brokerage records during discovery, all she introduced was that Thaxton filled in two checks, at Silvian's express direction, which Silvian signed, and which were not made payable for Thaxton's benefit. There was no evidence that Thaxton participated in the management

10

of Silvian's financial affairs. The evidence was to the contrary. Silvian kept a close and guarded watch on his finances. While Silvian may have placed general trust and confidence in Thaxton, that "is not sufficient to trigger the rebuttable presumption that undue influence was exercised." *Harper*, 554 S.E.2d at 456.

Without this presumption, Felts has the burden of proving by a preponderance of the evidence that Thaxton used undue influence to cause Silvian to designate her as the beneficiary of the Nationwide Annuity. Felts argues that due to Silvian's medical conditions, he had diminished capacity and was thus more susceptible to undue influence. As previously explained, however, Felts has failed to carry her burden of proving this undue influence. The evidence shows that on the day Silvian executed the change of beneficiary designation, his mental and emotional condition was stable.

Felts has failed to prove by a preponderance of the evidence that Thaxton applied such influence as to deceive, force, or coerce Silvian into designating her as the primary beneficiary of the Nationwide Annuity. "Undue influence which operates to invalidate [such a designation] is such influence as amounts either to deception or to force and coercion, destroying free agency." *Sims v. Sims*, 452 S.E.2d

11

761, 762 (Ga. 1995) (quoting *Bohler v. Hicks*, 48 S.E. 306, 310 (Ga. 1904)).

The evidence presented at trial shows that Thaxton received a substantial benefit from the change in beneficiary designation and that she had the opportunity to influence Silvian. But, "[e]vidence that shows no more than an opportunity to influence and a substantial benefit falls short of showing the exercise of undue influence." *Id.* "The indulgence of mere suspicion of undue influence cannot be allowed." *Harper*, 554 S.E.2d at 456 (quoting *McGee v. Ingram*, 448 S.E.2d 439, 440 (Ga. 1994)). To find from the evidence presented at trial that the change in beneficiary was the result of Thaxton's undue influence would require speculation and guesswork. Simply put, the change in beneficiary designation dated March 16, 2017, naming Pamela Thaxton as the primary beneficiary of the Nationwide Annuity is valid and enforceable.

CONCLUSION

Based on the foregoing findings of fact and conclusions of law, judgment shall be entered against Plaintiff and in favor of Defendant Pamela Thaxton. Nationwide shall pay the annuity benefits to Pamela Thaxton as the primary beneficiary under the

Nationwide Annuity.[3]  Defendant Thaxton, as the prevailing party, shall recover her costs from Plaintiff Felts.

IT IS SO ORDERED, this 6th day of November, 2025.

S/Clay D. Land
CLAY D. LAND
U.S. DISTRICT COURT JUDGE
MIDDLE DISTRICT OF GEORGIA

---

[3] Nationwide agreed to pay the proceeds of the Annuity to the party the Court determined was entitled to them and opted not to otherwise participate in the trial.